**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHERYLANN CARPENTER, Administrator of the Estate of SANDRA SCOTT, deceased, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | Case No. 04 C 2275 |
| OFFICE OF THE LAKE COUNTY SHERIFF, THE LAKE COUNTY SHERIFF, CHARLES M. DE FILIPPO, RODNEY K. HOLMES, PETER C. DICKSON, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

Plaintiff Cherylann Carpenter, Administrator of the Estate of Sandra Scott, deceased,

brought the present Third Amended Complaint alleging constitutional violations pursuant to 42

U.S.C. § 1983 and claims under the Illinois Wrongful Death Act against Defendants Lake

County Sheriff's Office and Lake County Sheriff Mark Curran.[1]  Plaintiff also brings this lawsuit

against Lake County Jail Correctional Officers Rodney Holmes and Peter Dickson, as well as

Charles De Filippo, the Director of Corrections at the Lake County Jail, among others.  Before

the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil

Procedure 56(c).  For the following reasons, the Court grants in part and denies in part

Defendants' motion.

---

[1]    During the relevant time period, the Lake County Sheriff was Gary Del Re.  (Defs.' Stmt. Facts ¶ 3.)  On January 1, 2007, the Court added Sheriff Mark Curran in substitution of Gary Del Re and dismissed Del Re from this action.  (*See* R. 252-1.)

# BACKGROUND[2]

## I.      Scott's Arrest & Medical Intake

This lawsuit is a result of decedent Sandra Scott's suicide while she was a pre-trial detainee at the Lake County, Illinois Jail.  (R. 270-1, Pl.'s Rule 56.1 Stmt. Facts ¶ 1.)  On March 24, 2003, Waukegan, Illinois police officers arrested Scott at approximately 8:00 p.m.  (R. 259-1, Defs.' Rule 56.1 Stmt. Facts ¶ 76.)  The next day, while Scott was in the Waukegan police lock-up, a police officer filled out a form entitled "Prisoner Condition Alert Form" which stated "15 minute watch due to her attemp [sic] to O.D. on clonazepan [sic] and that she was suicidal in the past.  Also she was very combative when she was arrested."  (*Id.* ¶ 77; Pl.'s Stmt. Facts ¶ 3.)

Scott's booking card indicates that Lake County Jail took her into custody at 10:10 a.m. on March 26, 2003.  (Defs.' Stmt. Facts ¶ 89.)  A registered nurse who worked for Correctional Medical Services of Illinois, Inc. ("CMS") – a private contractor that provides health care services at the Lake County Jail – performed Scott's medical intake and mental health assessment at approximately 2:00 p.m. on March 26, 2003.  (*Id.* ¶¶ 79, 80.)  When assessing Scott, the registered nurse, Genaline Japczyk, testified that she did not have the Prisoner Condition Alert Form indicating that Scott was suicidal.  (*Id.* ¶ 81.)  On Scott's intake form, however, Japczyk indicated that Scott was on psychotropic medications, had a history of psychiatric hospitalizations, and had recently attempted suicide.  (Pl.'s Stmt. Facts ¶ 15; R. 275-

---

[2]  The Court derives the background facts from the parties' Northern District of Illinois Local Rule 56.1 statements.  A litigant's failure to respond to a Local Rule 56.1 statement results in the Court admitting the uncontroverted statements as true.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).  In addition, the Court may disregard statements and responses that do not properly cite to the record.  *See Cichon v. Exelon Generation Co., L.L.C.* 401 F.3d 803, 809-10 (7th Cir. 2005); *Brasic v. Heinemann's Inc.,* 121 F.3d 281, 284 (7th Cir. 1997).

1, Pl.'s Ex. D-4, CMS Medical History & Screening; Pl.'s Ex. 12, Jarpczyk Dep., at 23-30).

Japczyk did not conclude that Scott was a suicide risk and referred Scott to the general

population of the Lake County Jail.  (*Id.* ¶ 16; Pl.'s Ex. D-4, CMS Medical History &

Screening.)  Japczyk testified that had she known about Scott's Prisoner Condition Alert Form or

that Scott was combative when the police officers arrested her, it would have made a difference

in her treatment of Scott.  (Pl.'s Stmt. Facts ¶ 22.)

## II.     Scott's Booking at Lake County Jail

Correctional Officers Rodney Holmes and Peter Dickson worked the booking desk at the

Lake County Jail on March 26, 2003, and booked Scott sometime between 3:00 p.m. and 6:00

p.m. that day.  (Defs.' Stmt. Facts ¶¶ 86, 87.)  At his deposition, Holmes testified that Scott was

typical of most inmates and was agitated at being in custody, but she was not combative or

hostile.  (*Id.* ¶ 88.)  Similarly, Dickson testified that Scott was upset at being incarcerated, but

that she did not act differently than other females whom he had booked.  (*Id.* ¶ 96.)  Both

Holmes and Dickson further testified that they never saw Scott's Prisoner Condition Alert Form

indicating that Scott was suicidal, and Dickson further testified that he had no knowledge that

Scott had a history of suicide attempts.  (*Id.* ¶¶ 90, 97, 99.)  During the investigation of Scott's

death, however, indented impressions of both Holmes' and Dickson's initials were found on

Scott's Prisoner Condition Alert Form.  (*Id.* ¶¶ 115.)  Holmes and Dickson admitted that these

were their initials imprinted on the Prisoner Condition Alert Form, and Holmes further admitted

that the purpose of initialing the form was to indicate that he had seen or was aware of the form.

(Pl.'s Stmt. Facts ¶ 12; Pl.'s Ex. 10, Holmes Dep., at 27-28.)  The record contains other evidence

that upon her arrival at booking, Scott had both her Prisoner Condition Alert Form and a court

remand order for Scott to receive a psychological evaluation. (Pl.'s Stmt. Facts ¶ 2; Defs.' Stmt. Facts ¶ 95.) Dickson and Holmes did not put Scott on suicide watch and Holmes assigned Scott to cell 48 in the female housing unit. (Pl.'s Stmt. Facts ¶ 10; Defs.' Stmt. Facts ¶ 94.)

## III.    Scott's Mental Health Assessment

On March 27, 2003, a CMS clinical social worker, Joel Mollner, performed Scott's mental health assessment. (*Id.* ¶¶ 103-04, 106; Pl.'s Stmt. Facts ¶ 17.) On Scott's assessment form, Mollner indicated that Scott had a psychiatric history and inpatient treatment, several prescriptions for psychiatric medications (Klonopin and Xanax), a history of suicidal ideaologies, and a history of suicide in her family. (Pl.'s Stmt. Facts ¶ 17; Pl.'s Ex. D-5, CMS Mental Health Intake). Mollner further indicated that Scott had attempted suicide the previous week due to losing custody of her daughter. (*Id.* ¶ 18; Pl.'s Ex. D-5, CMS Mental Health Intake; Defs.' Ex. 13, Mollner Dep., at 23.) At his deposition, however, Mollner testified that "there was absolutely no presentation of any kind of suicidal ideation from her during the entire hour I was with her." (Defs.' Stmt. Facts ¶ 108; Defs.' Ex. 13, Mollner Dep., at 23.) Another correctional officer, LaShonda Amen, however, testified that during Scott's interview with Mollner, Scott acted strangely, yelled, and cried. (Pl.'s Stmt. Facts ¶ 19.) Amen thought that Mollner would place Scott on a 15-minute suicide watch. (*Id.* ¶ 37.) Mollner did not put Scott on a suicide watch, but referred her to a psychiatrist. (Defs.' Stmt. Facts ¶ 111.) Mollner testified that he was unaware of Scott's Prisoner Condition Alert Form, but if he had known the information on the form, he would have placed Scott on a 15-minute suicide watch. (*Id.* ¶ 133; Pl.'s Stmt. Facts ¶ 21.)

## IV.    Scott's Suicide

Thereafter, Dickson transferred Scott to cell 23 on a lower level of the jail away from other inmates because Scott appeared to be "agitated and upset at something." (Defs.' Stmt. ¶ 98; R. 260-1, Defs.' Ex. 10, Dickson Dep., at 27-30; Pl.'s Stmt. Facts ¶ 11.) On March 29, 2003, Scott committed suicide by hanging herself with a bed sheet woven through the holes in a shelving unit attached her cell wall. (Pl.'s Stmt. Facts ¶¶ 1, 23.)

**V.      Other Suicides at Lake County Jail**

Prior to Scott's suicide, three other detainees committed suicide at the Lake County Jail. (*Id.* ¶ 24.) Just after the jail opened in 1988, a male inmate hung himself by threading a sheet through an air vent near the booking desk. (*Id.* ¶ 25.) In 1996, another woman hung herself with a bed sheet. (*Id.* ¶ 26.) In addition, Justin Farver committed suicide in October 1998 by hanging himself with a bed sheet attached to a shelving unit in his cell. (*Id.* ¶ 27.) After the Farver suicide, certain Lake County officials met to determine whether the jail needed to make any changes. (*Id.* ¶¶ 28, 29; Defs.' Stmt. Facts ¶ 72.) As a result, the jail removed hooks from the shelving units in certain cells, although Defendants contend that Lake County officials did not sanction this action. (Pl.'s Stmt. Facts ¶ 29; Defs.' Stmt. Facts ¶ 70.) In any event, no other changes were made at the jail. (Pl.'s Stmt. Facts ¶ 29.)

Farver's estate brought a Section 1983 lawsuit against the Office of the Lake County Sheriff and CMS, among others. (Pl.'s Stmt. Facts ¶¶ 52, 55.) The Farver suit concerned Farver's suicide while he was a pre-trial detainee at Lake County Jail. (*Id.* ¶ 53.) At the time of Farver's suicide, CMS and CMS social worker Joel Mollner provided medical services at the Lake County Jail. (*Id.* ¶ 54.) After a 2003 trial in federal district court, the jury found in favor of Farver's estate and the Seventh Circuit upheld the jury's verdict on appeal in 2004. (*Id.* ¶ 55.)

*See Woodward v. Correctional Med. Serv.*, 368 F.3d 917, 919 (7th Cir. 2004). The Office of the Lake County Sheriff settled before trial. (*Id.* ¶ 56.)

## VI. Director of Corrections Charles De Filippo & Correctional Officer Training

From 1996 until 2000, Charles De Filippo was Deputy Director of Corrections at the Lake County Jail. (Defs.' Stmt. Facts ¶ 68.) In 2000, De Filippo was named Director of Corrections, a position that he held until July 2003. (*Id.*) While De Filippo was Director of Corrections, he had oversight of CMS and coordinated with CMS management. (*Id.* ¶ 73.) In addition, De Filippo taught a training course to Lake County Jail Correctional Officers. (Pl.'s Stmt. Facts ¶ 44.) This class, entitled "inmates in crisis," was a general course for managing prisoners. (*Id.* ¶¶ 44, 45.) De Filippo testified that "an inmate in crisis is not necessarily a suicidal inmate," but that the correctional officers treated all inmates that enter the jail as potential "inmates in crisis." (*Id.* ¶ 46.)

Moreover, all newly hired correctional officers had to successfully complete a period of almost 200 hours of Field Training under the supervision of a Field Training Officer at the jail. (Defs.' Stmt. Facts ¶ 51.) The Field Training Officers followed a Certified Field Training Manual in training the new officers. (*Id.* ¶ 52.) Part of the correctional officers' training included training in human behavior and interpersonal relationships with a one week module in psychology that addressed suicide prevention. (*Id.* ¶ 57.) The Lake County Corrections Division also taught a course called Principles and Dynamics of Direct Supervision that included a module on the recognition of potentially suicidal inmates and prevention of suicides. (*Id.* ¶¶ 59, 60.)

Also during training, the Lake County Jail correctional officers received a packet of

existing post orders and received new post orders when they issued, although the officers were never tested or questioned on these orders. (Pl.'s Stmt. Facts ¶¶ 48, 50.) Lake County Post Order 11.20.1 concerns the identification of potentially suicidal inmates. (*Id*. ¶ 5.) It listed possible signs indicating inmates at risk, such as an "inmate having a documented history of previous suicidal attempts(s) or self-harm." (*Id*. ¶¶ 5, 6; Pl.'s Ex. 3, Post Order 11.20.1.) Post Order 11.20.1 also provides that any staff member concerned that an inmate is potentially suicidal must inform a command officer immediately, who in turn must notify the medical staff so they can place the inmate on a suicide watch. (*Id*. ¶ 7; Defs.' Stmt. Facts ¶ 43.) Post Order 11.5.1 sets forth the emergency medical procedures if an inmate attempts suicide in the jail. (Defs.' Stmt. Facts ¶ 41.) Other post orders provide the correctional officers guidance as to inmate suicide prevention, inmate well-being checks, and suicide watch monitoring. (*Id*. ¶¶ 39, 42, 45.)

## VII.   CMS's Policy & Procedures

CMS had written policies in place that the Director of Corrections of the Lake County Sheriff's Adult Corrections Division approved. (*Id.* ¶ 22.) These policies required the screening of newly arrived detainees to identify inmates who posed a threat to their own or others safety and for suicidal tendencies. (*Id.*) The policy also provided for a complete medical and mental health screening within fourteen days of an inmate's admission, including a history of suicidal ideation and the referral of detainees in need of mental health services. (*Id.*)

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In determining summary judgment motions, courts construe the facts and all reasonable inferences in the light most favorable to the non-moving party.  *Id.* at 255.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## ANALYSIS

Plaintiff contends that there are genuine issues of material fact whether Defendants were deliberately indifferent to Scott's medical needs.  Plaintiff's deliberate indifference claims fall under the Cruel and Unusual Punishment Clause of the Eighth Amendment which protects inmates from a prison official's deliberate indifference to a serious harm or medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  The Due Process Clause of the Fourteenth Amendment extends this Eighth Amendment right to pre-trial detainees.  *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) (pre-trial detainee's due process rights are at least as great as Eighth Amendment protections available to convicted prisoners); *see also Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir. 2003).

"A prison official's duty under the Eighth Amendment is to ensure reasonable safety."

*Farmer v. Brennan,* 511 U.S. 825, 844-45, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation and internal quotation omitted). In general, a prison official who knows of a substantial risk to an inmate's health cannot be held liable if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* More specifically, "whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845 (italics omitted).

"A deliberate indifference claim requires both an objectively serious risk of harm and a subjectively culpable state of mind." *Edwards v. Snyder,* 478 F.3d 827, 830 (7th Cir. 2007) (citing *Farmer,* 511 U.S. at 834). As such, to establish deliberate indifference a plaintiff must show that (1) she suffered from an objectively serious medical condition or need, and (2) prison officials subjectively knew of and disregarded her needs. *Farmer,* 511 U.S. at 834; *Palmer,* 327 F.3d at 594. "The subjective component of a deliberate indifference claim requires that the prison official knew of 'a substantial risk of harm to the inmate and disregarded the risk.'" *Edwards*, 478 F.3d at 831 (citation omitted). Therefore, deliberate indifference is more than negligence. *Johnson v. Snyder,* 444 F.3d 579, 585 (7th Cir. 2006); *see also Farmer,* 511 U.S. at 837 (official must act in an intentional or criminally reckless manner).

"Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman,* 462 F.3d 757, 761 (7th Cir. 2006). Under the first query, "the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." *Id.*; *see also Boncher ex rel. Boncher v. Brown County,*

272 F.3d 484, 488 (7th Cir. 2001) (liability does not attach where defendants were not alerted to likelihood that inmate was genuine suicide risk). Under the second component, the plaintiff must establish that the prison official failed to take reasonable steps to prevent the inmate from attempting or committing suicide. *Estate of Novack v. County of Wood,* 226 F.3d 525, 529 (7th Cir. 2000) ("to be liable under the Eighth Amendment, a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act.").

## I.      Correctional Officers Dickson & Holmes

Plaintiff contends that there are genuine issues of material fact for trial that Correctional Officers Dickson and Holmes were deliberately indifferent to Scott's medical needs. The parties do not dispute that Scott suffered from an objectively serious medical condition or need. *See Collins,* 462 F.3d at 761 ("it goes without saying that suicide is a serious harm") (citation and quotations omitted). Thus, the Court turns to whether Dickson and Holmes were aware of the significant likelihood that Scott would commit suicide, yet failed to take reasonable steps to prevent Scott from doing so. *See id.*; *Estate of Novack,* 226 F.3d at 529.

### A.      Deliberate Indifference

Viewing the evidence and all reasonable inferences in favor of Plaintiff, Dickson's and Holmes' imprinted initials on Scott's Prisoner Condition Alert Form – which indicated that Scott was suicidal – raise a genuine issue of material fact whether they were alerted to the likelihood that Scott was at a substantial risk for committing suicide. *See Collins*, 462 F.3d at 761. In addition, Holmes admitted that the purpose of initialing the form was to indicate that he had seen or was aware of it. As such, although Dickson and Holmes testified that they did not see Scott's

Prison Condition Alert Form, their testimony is contradicted by their imprinted initials on the form which supports the reasonable inference that they – in fact – saw the form.

The Court next turns to whether the correctional officers intentionally disregarded the suicide risk or whether they took reasonable steps to prevent Scott from committing suicide. As the record indicates, they placed Scott in the general population at the Lake County Jail, and not on a 15 minute suicide watch as indicated on her Prisoner Condition Alert Form. Further, CMS social worker Mollner testified that had he known the information on Scott's Prisoner Condition Alert Form, he would have placed Scott on a 15-minute suicide watch. Likewise, CMS intake nurse Japczyk testified that if she had been notified about Scott's Prisoner Condition Alert Form or that Scott was combative when arrested, it would have made a difference in her treatment of Scott.

Viewing this evidence in favor of Plaintiff, there is a genuine issue of material fact that Dickson and Holmes intentionally disregarded Scott's serious medical need and did not take reasonable steps to prevent her from committing suicide. *See Collins*, 462 F.3d at 761; *Estate of Novack*, 226 F.3d at 529. In other words, there is evidence in the record to support the inference that Dickson and Holmes intentionally disregarded a known, imminent suicide risk. *See Collins*, 462 F.3d at 762. Accordingly, there are genuine issues of fact for trial whether Dickson and Holmes were deliberately indifferent to Scott's medical needs.

### B.     Qualified Immunity

Dickson and Holmes argue that the doctrine of qualified immunity protects them from Plaintiff's deliberate indifference claim. In general, qualified immunity shields government officers performing discretionary functions from civil litigation. *See Harlow v. Fitzgerald,* 457

U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When determining whether qualified immunity shields a public official from a Section 1983 action, the Court undertakes a two-part inquiry. *Mannoia v. Farrow,* 476 F.3d 453, 457 (7th Cir. 2007) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The Court's first inquiry is whether the facts, viewed in the light most favorable to Plaintiff, show that Dickson and Holmes violated a constitutional right. *See id.* (citing *Saucier,* 533 U.S. at 201). If the facts comprise a constitutional violation, the Court's second inquiry is whether the constitutional right "was firmly established at the time of the alleged injury, such that a reasonable officer would understand that his actions are in violation of that right." *Mannoia,* 476 F.3d at 457 (citing *Saucier*, 533 U.S. at 201).

Viewing Plaintiff's submissions in her favor, a constitutional violation "could be made out," and thus the Court goes to the next step, namely, whether the constitutional right was clearly established at the time of the violation. *See Saucier,* 533 U.S. at 201; *Alexander v. City of Milwaukee,* 474 F.3d 437, 444 (7th Cir. 2007). Under the second inquiry, it is Plaintiff's burden to establish that Scott's Eighth Amendment rights were "clearly established." *Wernsing v. Thompson,* 423 F.3d 732, 742 (7th Cir. 2005). To do so, Plaintiff "must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202; *Sallenger v. Oakes,* 473 F.3d 731, 739 (7th Cir. 2007) ("If the right was clearly established, the government actor is ***not*** entitled to qualified immunity.")

12

(emphasis in original).

Although Plaintiff "is not required to produce a case that is 'directly on point' to show that a right is clearly established," *see Moss v. Martin,* 473 F.3d 694, 702 (7th Cir. 2007), there is a Seventh Circuit case that is directly on point, and thus dispositive. *See Cavalieri v. Shepard,* 321 F.3d 616 (7th Cir. 2003). In *Cavalieri*, a pre-trial detainee at the Champaign County Correctional Facility attempted suicide by hanging himself with a telephone cord. *Id.* at 619-20. The *Cavalieri* court determined that there was "no doubt" that the pre-trial detainee's "right to be free from deliberate indifference to suicide" was clearly established before the 1998 attempted suicide. *Id.* at 622-23 (citing *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992)). Thus, the Seventh Circuit concluded that the law as it existed at the time of the pre-trial detainee's suicide attempt provided the officer with fair notice that his conduct was unconstitutional. *See Cavalieri*, 321 F.3d 623. Specifically, the court stated that the "rule that officials, including police officers, will be 'liable under section 1983 for a pre-trial detainee's suicide if they were deliberately indifferent to a substantial suicide risk,' *Hall v. Ryan,* 957 F.2d 402, 406 (7th Cir. 1992), was clearly established prior to 1998." *Id.* at 623-24.

Under the similar facts in this matter, Correctional Officers Dickson and Homes are not entitled to qualified immunity because the law at the time of Scott's suicide put them on notice that they would be liable for a pre-trial detainee's suicide if they were deliberately indifferent to a substantial suicide risk. *See Saucier,* 533 U.S. at 202; *Cavalieri,* 321 F.3d at 623-34. The Court thus denies Defendants' summary judgment motion as to Dickson and Holmes.

## II. Lake County Sheriff's Office

### A. Official Capacity Claims

Next, Plaintiff contends that the Lake County Sheriff's Office, Sheriff Mark Curran, and Director De Filippo were deliberately indifferent to Scott's medical needs. Plaintiff's deliberate indifference claim against Sheriff Curran and De Filippo in their official capacities is a claim against the Lake County Sheriff's Office as a governmental unit. *See Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985) (citing *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658, 690, n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Put differently, official capacity suits brought against individuals are "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. at 165 (citation omitted). Because Plaintiff's claims against Sheriff Curran and De Filippo in their official capacities are redundant to Plaintiff's claim against the Lake County Sheriff's Office, the Court dismisses Sheriff Curran and De Filippo in their official capacities from this lawsuit. Before the Court discusses Plaintiff's claims against Sheriff Curran and De Filippo in their individual capacities, the Court turns to Plaintiff's *Monell* claims against the Lake County Sheriff's Office.

**B.    Monell Claims**

Under Section 1983, a government agency cannot be liable under the theory of respondeat superior. *Monell,* 436 U.S. at 691 ("municipality cannot be held liable ***solely*** because it employs a tortfeasor") (emphasis in original); *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 765 (7th Cir. 2006) (same). Instead, to establish liability against the Lake County Sheriff's Office, Plaintiff must show that (1) Scott suffered a deprivation of a federal right, (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that (3) proximately caused her constitutional injury. *Ovadal*

*v. City of Madison,* 416 F.3d 531, 535 (7th Cir. 2005). More specifically, unconstitutional

policies or customs include: (1) an express policy that, when enforced, causes a constitutional

deprivation; (2) a widespread practice that, although not authorized by written law or express

municipal policy, is so permanent and well settled as to constitute a custom or usage with the

force of law; or (3) an allegation that a person with final policymaking authority cause the

constitutional injury.[3] *Phelan v. Cook County,* 463 F.3d 773, 789 (7th Cir. 2006) (citation and

quotations omitted).

Plaintiff argues that the Lake County Sheriff's Office has widespread practices that

reflect the Office's deliberate indifference to the medical needs of mentally ill detainees,

including (1) inadequately training its correctional officers, and (2) failing to exercise sufficient

oversight of CMS. *See Estate of Novack*, 226 F.3d at 529. Under the *Monell* widespread

practice theory, Plaintiff must establish an unconstitutional pattern of conduct to give rise to the

inference that an unconstitutional custom or practice exists. *See Calhoun v. Ramsey,* 408 F.3d

375, 380 (7th Cir. 2005); *see also Fairley v. Andrews,* 430 F.Supp.2d 786, 801 (N.D. Ill. 2006)

(citation omitted). As the *Calhoun* court explained

> what is needed is evidence that there is a true municipal policy at issue, not a random
> event. If the same problem has arisen many times and the municipality has acquiesced in
> the outcome, it is possible (though not necessary) to infer that there is a policy at work,
> not the kind of isolated incident that [*Board of the County Comm'rs of Bryan County v.
> Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)] held cannot support
> municipal liability. So, for example, in addressing whether a city's failure adequately to
> train its police officers amounted to a policy for *Monell* purposes, the Supreme Court had

---

[3] Plaintiff states that she is bringing her claims against Sheriff Curran and De Filippo in their official capacities and/or based on their decision-making authority. (R. 268-1, Pl.'s Resp. Brief, at 9.) Plaintiff, however, does not argue that the Sheriff or De Fillipo caused Scott's constitutional injury because they had final policymaking authority under the third *Monell* prong.

the following to say:

> [T]he word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from conscious choice-that is, proof that the policymakers deliberately chose a training program which would prove inadequate.

*Calhoun,* 408 F.3d at 380 (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion)).

Here, Plaintiff has set forth evidence that other suicides have occurred at the Lake County Jail since 1988, most notably Justin Farver's suicide. *See Woodward v. Correctional Med. Serv.*, 368 F.3d 917, 919 (7th Cir. 2004). In *Woodward*, after a three week trial, a jury found that CMS and CMS social worker Joel Mollner acted with deliberate indifference to Farver's heath and safety. *Id.* at 920. The Seventh Circuit upheld the jury verdict and concluded that there was enough evidence for the jury to conclude that CMS's actual practice – as opposed to its written policies – toward treating mentally ill inmates was so inadequate that CMS was on notice from the time Farver was incarcerated that he would be deprived of necessary care in violation of his Eighth Amendment rights. *Id.* at 927. Further, the court concluded that "a reasonable jury could find that CMS's custom of repeatedly failing to follow proper procedures led to Farver's successful suicide attempt." *Id.* at 928.

Unlike *Woodward*, in the present action the Court is not evaluating CMS's policies, but must determine whether Plaintiff has introduced evidence showing that there is a genuine issue of material fact regarding the Lake County Sheriff's Office's alleged widespread practices. *See Palmer*, 327 F.3d at 595 (citing *Celotex Corp.,* 477 U.S. at 324). Put another way, Plaintiff must

present evidence that the Lake County Sheriff's Office had a widespread custom or practice reflecting the Office's deliberate indifference to the medical needs of mentally ill detainees. Therefore, the fact that other inmates committed suicide at the Lake County Jail or that a jury found CMS liable for its widespread practice – alone – are not dispositive in this matter.

Instead, Plaintiff points to two "widespread practices" that the Court must address: (1) whether the Sheriff's Office inadequately trained its correctional officers; and (2) whether the Sheriff's Office failed to exercise sufficient oversight of CMS. The Court first turns to Plaintiff's argument concerning the Lake County Sheriff's Office training of its correctional officers.

### 1.     Training of Correctional Officers

"[T]here are only 'limited circumstances' in which a 'failure to train' will be characterized as a municipal policy under section 1983." *Robles v. City of Fort Wayne,* 113 F.3d 732, 735 (7th Cir. 1997) (quoting *Brown*, 520 U.S. at 407.)). Such a claim must relate to "a deficient training 'program,' necessarily intended to apply over time to multiple employees." *Brown,* 520 U.S. at 407 (citing *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed. 2d 412 (1989)). The *Brown* Court further articulated:

> Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the "deliberate indifference"[4]-necessary to trigger municipal

---

[4] "Deliberate indifference" is a term used in both Eighth Amendment claims and constitutional actions against municipalities. *See Farmer v. Brennan,* 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Specifically, "deliberate indifference serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability." *Id.* On the

liability.

*Brown*, 520 U.S. at 407.  Accordingly, the Seventh Circuit has explained that "[i]t is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once.  The plaintiff must introduce evidence demonstrating that the unlawful practice was ***so pervasive*** that acquiescence on the part of policymakers was apparent and amounted to a policy decision."  *Phelan*, 463 F.3d at 790 (emphasis added).  As such, Plaintiff must set forth evidence of a "series of bad acts [ ] inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers."  *Woodward,* 368 F.3d at 927 (citing *Estate of Novack*, 226 F.3d at 530 (citation omitted)).

Here, Plaintiff has not produced evidence creating an inference that the Lake County Sheriff's Office was deliberately indifferent under this standard.[5]  Although Plaintiff has set forth evidence of three other suicides at the Lake County Jail and the fact that a jury found CMS and CMS agent Joel Mollner deliberately indifferent to the medical needs of Justin Farver, she has not produced any evidence demonstrating that the correctional officers' lack of training

---

other hand the "term was used in the *Canton* case for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents."  *Id*. (quoting *Collins v. Harker Heights,* 503 U.S. 115, 124, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)).

[5]  In her legal memorandum, Plaintiff argues that the Court should weigh the evidence and make credibility determinations.  (*See* R. 268-1, Pl.'s Mem. Opposition, at 4, 17.)  Because the Court cannot make credibility determinations or weigh evidence at summary judgment, Plaintiff's arguments are misplaced.  *See Paz v. Wauconda Healthcare & Rehab. Centre, LLC,* 464 F.3d 659, 664 (7th Cir. 2006).

concerning mentally ill inmates was ***so pervasive*** that it amounted to a policy decision. *See Phelan*, 463 F.3d at 790. Plaintiff, for example, does not present evidence of the correctional officers' conduct in relation to the 1988 and 1996 suicides or in the context of any other suicidal or mentally ill inmate at the Lake County Jail. In fact, Plaintiff fails to supply any details about the correctional officers' conduct – as opposed to CMS's or Mollner's conduct – concerning the Farver suicide.

Meanwhile, Correctional Officer LaShonda Amen's testimony that some correctional officers did not read the post orders does not support the inference that the Sheriff's Office's alleged lack of training was so pervasive and inadequate as to constitute deliberate indifference on behalf of the Sheriff's Office, especially in light of the undisputed fact that part of the correctional officers' training involved instruction in human behavior and interpersonal relationships, including training in suicide prevention.

Finally, although there is a genuine issue of material fact whether Correctional Officers Dickson and Holmes were aware of the significant likelihood that Scott would commit suicide, the fact "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton,* 489 U.S. at 390-91. In addition, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." *Id*. at 391.

In sum, construing the evidence and all reasonable inferences in Plaintiff's favor, Plaintiff has failed to present evidence creating a genuine issue of material fact that the alleged inadequate training "resulted from conscious choice," namely, "that the policymakers

deliberately chose a training program which would prove inadequate." *Calhoun,* 408 F.3d at 380. Therefore, Plaintiff's inadequate training argument fails.

### 2. Supervision of CMS

Plaintiff's next argument is that the Lake County Sheriff's Office failed to exercise sufficient oversight of CMS. Plaintiff attempts to establish the Sheriff's Office's liability through a theory of respondeat superior which – as discussed above – cannot form the basis of municipal liability. *See Estate of Novack*, 226 F.3d 530-31. More specifically, Plaintiff points to the conduct of CMS agents Japczyk and Mollner while screening Scott's mental health in this matter and relies on case law concerning "supervisory authority" in the context of individual capacity claims. *See, e.g., Kernats v. O'Sullivan,* 35 F.3d 1171, 1182 (7th Cir. 1994); *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988). The *Kernats* decision, however, highlights the correct legal standard for municipal liability. *See Kernants*, 35 F.3d at 1182 ("It is well settled that the doctrine of respondeat superior may not be employed to impose § 1983 liability on a supervisor for the conduct of a subordinate that violates a citizen's constitutional rights.") Further, the *Jones* case Plaintiff cites did not involve municipal liability, but was a Section 1983 conspiracy claim in which the jury concluded that because the supervising police officers approved of their subordinates' conduct, they were liable in their individual capacities. *See Jones*, 856 F.3d at 993. Plaintiff's argument is therefore misplaced.

Nonetheless, Plaintiff has produced sufficient evidence that the Lake County Sheriff's Office has a widespread practice of failing to exercise sufficient oversight of CMS. Again, "what is needed is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it

is possible (though not necessary) to infer that there is a policy at work." *Calhoun,* 408 F.3d at 380. Plaintiff must present some evidence that the Lake County Sheriff's Office systematically or repeatedly failed in its oversight of CMS. *See Bradich v. City of Chicago,* 413 F.3d 668, 690 (7th Cir. 2005); *Woodward,* 368 F.3d at 928.

Evidence in the record reveals that after Farver's suicide, certain Lake County officials met to determine whether the jail needed to make any changes. As a result of this meeting, no changes were made – except for the removal of some hooks from certain jail cells – including any changes to the Sheriff's Office's supervision of CMS personnel. Viewing this evidence in Plaintiff's favor, the fact that Lake County officials did not make any changes after the Farver suicide creates an inference that Lake County Sheriff's Office systematically or repeatedly failed in its oversight of CMS to the point that the Sherriff's Office chose "an impermissible way of operating." *See Calhoun,* 408 F.3d at 381. In other words, there is evidence in the record that the Lake County Sheriff's Office had a widespread practice of failing to supervise CMS personnel to whom they had delegated the medical care of the jail's inmates. Therefore, the Court denies Defendants' summary judgment motion on this claim.

## III. Individual Capacity Claims Against Supervisors

Last, the Court evaluates whether the Lake County Sheriff or De Filippo are liable in their individual capacities. For an individual to be liable under Section 1983, he or she must have participated directly in the constitutional violation. *See Palmer,* 327 F.3d at 594. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Hildebrandt v. Illinois Dep't of Natural Res.,* 347 F.3d 1014, 1039 (7th Cir. 2003)

(quoting *Vance v. Peters,* 97 F.3d 987, 991 (7ᵗʰ Cir. 1996)).  Put differently, because a Section 1983 claim is against a "person" –  a plaintiff must establish that the defendant was personally responsible for the alleged constitutional deprivation.  *Johnson,* 444 F.3d at 583.  Supervisors satisfy the personal responsibility requirement if the conduct causing the constitutional violation occurred at the supervisor's direction or with his knowledge and consent.  *Hildebrandt,* 347 F.3d at 1039; *see also Johnson,* 444 F.3d at 583-84 (to be personally responsible, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.") (citation omitted).  "In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for Section 1983 recovery."  *Hildebrandt,* 347 F.3d at 1039.

Here, there is no evidence that De Filippo or the Sheriff caused or directly participated in the alleged constitutional violation.  *See Hildebrandt,* 347 F.3d at 1039.  Further, there is nothing in the record indicating that the constitutional violation occurred at the Sherriff's or De Filippo's direction or with their knowledge and consent.  *See id.*; *Johnson,* 444 F.3d at 583-84.  Although supervisors may be liable for the bad acts of their subordinates, Plaintiff has failed to present evidence that the Sheriff or De Fillippo had "knowledge of a subordinate's conduct" and "approve[d] of the conduct and the basis for it."  *Kernats,* 35 F.3d at 1182.  Viewing the evidence and all reasonable inferences in favor of Plaintiff, she has failed introduce evidence showing that there is a genuine issue for trial concerning a causal connection or affirmative link between Scott's suicide and the Sheriff's and De Fillipo's individual conduct.  *See Anderson v. Liberty Lobby,* 477 U.S. at 255; *Hildebrandt,* 347 F.3d at 1039.  Accordingly, the Court dismisses De Filippo and the Lake County Sheriff from this lawsuit.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' Motion for

Summary Judgment.  The Court dismisses Defendants' Motions to Strike as moot.

Date: May 2, 2007

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**